IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANN WILLIS, | |
| Plaintiff, | Case No. 1:12-cv-07662 |
| v. | |
| CAREER EDUCATION CORPORATION, AMERICAN INTERCONTINENTAL UNIVERSITY, and KATHRYN LANGE, individually, | Honorable Judge John J. Tharp, Jr.<br><br>Magistrate Judge Michael T. Mason |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Ann Willis, by and through her attorneys, The Case Law Firm, LLC, submits this Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.

## Introduction

While taking six weeks of "Family and Medical Leave Act" ("FMLA") leave for uterine fibroid surgery to resolve infertility, Plaintiff's supervisors began targeting her for termination. One day after Plaintiff returned from leave, her supervisor admonished her for taking the leave, threatened her with a reduction in force, and then gave most of her job responsibilities to a male coworker. Less than one month after Plaintiff's leave, Defendants suspended Plaintiff and then terminated her for false and pretextual reasons.

## Facts

Prior to her FMLA leave, Plaintiff had worked for Defendants Career Education Corporation ("CEC") and American InterContinental University ("AIU") for three years as a Senior Financial Analyst in the Finance Department and always received positive performance

1

ratings. Plaintiff's Response to Defendants' Undisputed Material Facts ("PRDF") ¶ 3; Plaintiff's Statement of Additional Material Facts ("PF") ¶ 1. On September 14, 2010, after a year of unsuccessful fertility treatments, Plaintiff consulted Dr. Vishvanath Karande, who discovered that Plaintiff had uterine tumors ("fibroids"), which prevented her from conceiving, and that Plaintiff needed surgery to remove them. Defendants' Statement of Undisputed Material Facts ("DF") ¶15; PRDF ¶ 16; PF ¶ 2.

On September 20, 2010, Plaintiff notified her immediate supervisor, Defendant Katherine Lange ("Lange"), that she needed surgery to remove the fibroids, which would require "two to six weeks" of leave. PF ¶ 3. On October 13, 2010, Plaintiff told Lange that her surgery would occur during the last week of that month, October 2010. DF ¶ 21. Lange testified that this notice gave her sufficient time to plan for Plaintiff's absence. PRDF ¶ 30. Plaintiff subsequently coordinated her FMLA leave with Human Resources ("HR"). PRDF ¶¶ 23-25.

Based on her doctor's recommendation, Plaintiff applied for six weeks of FMLA leave and HR approved her for all six weeks, extending from October 27, 2010 to December 8, 2010. PF ¶ 6 (Ex. 14, Willis 00251-254; Ex. 15, Willis 00259).

On Thursday, October 21, 2010, Plaintiff received a surgery date from the hospital and a concrete FMLA start date from HR. PF ¶ 4. That Monday, October 25, 2010, Plaintiff notified Lange that her FMLA leave would begin on October 27, 2010. DF ¶ 29. Prior to her leave, Plaintiff successfully completed all of her assigned tasks, including the population and revenue model for the budget. PRDF ¶¶ 36-37.

Defendants' policy required HR to notify an employee's manager of the leave either after the employee submitted the FMLA application or once the leave was approved. PF ¶ 5.

On October 29, 2010, Plaintiff underwent fibroid surgery, which her doctor described as "major abdominal surgery," and was hospitalized for two days. PF ¶¶ 7-8. The surgery resulted in "major abdominal pain," which prevented Plaintiff from concentrating, sitting, walking, lifting, bending, and returning to work prior to the expiration of her six week leave. PF ¶¶ 9-10.

During Plaintiff's leave, Lange took over her responsibilities. DF ¶ 38. Lange admitted feeling "upset, frustrated, and concerned" because of the long hours she had to work during Plaintiff's leave. PRDF ¶ 39. Lange reported feeling disrupted by the "undue stress" of handling Plaintiff's workload and blamed that "undue stress" on Plaintiff's leave. PRDF ¶ 39. Lange vocalized her frustration to other employees, making a myriad of negative comments about Plaintiff's leave. PF ¶ 14.

Plaintiff hoped to be able to return to work earlier than six weeks but she was unable to do so because of her pain. PF ¶ 13. Upon learning that, Lange became "irked" and emailed her supervisor, Nate Swanson, Senior Vice President of Finance & Administration, stating "I'm not surprised." DF ¶ 44. Swanson agreed with Lange that Plaintiff was "very disrespectful" and, copying Nicole Herzog ("Herzog") in Human Resources, asked, "can we start to search for a replacement/add to staff . . . ." PF ¶ 15 (Ex. 22, CEC-AIU 005270-5271). Herzog told Swanson that he could not fire Plaintiff while she was on a medical leave, so on December 7, 2010, Swanson developed a written discussion planner to help Lange reprimand Plaintiff for her leave. PF ¶¶ 15-16 (Ex. 23, CEC-AIU 017985-17986; Ex. 24, CEC-AIU 011357-11362). Swanson noted in this discussion planner that he wanted to help Lange hold Plaintiff "accountable for 1) the amount of work she misses . . . and 3) her responsibility to Kathy [Lange]'s team and the school – acknowledging the impact of [sic] her absences on Kathy's quality of life." PF ¶ 16 (Ex. 24, CEC-AIU 011357-11362). That same day, on December 7, 2010, Lange created a

3

document proposing to reduce the Finance Department (which at the time had only three full-time employees) by one employee. PF ¶ 18 (Ex. 26, Willis 00360-361).

Plaintiff returned to work on December 9, 2010. PF ¶ 19. The very next day, Lange did what Swanson suggested and admonished Plaintiff for taking time off, told Plaintiff that she had decided to shift the majority of her job responsibilities to one of her coworkers, Frank Patano ("Patano"), and warned Plaintiff that reductions in force were coming. PF ¶ 20. In the following weeks, Lange made Plaintiff teach Patano how to do her job. PF ¶ 21.

Several weeks later, Lange claimed that Patano told her that Plaintiff had shown him confidential bonus and compensation information and that he had reviewed it to see what others were paid. PRDF ¶ 58. When confronted with these accusations, Plaintiff denied them. PF ¶ 22. Despite Plaintiff's denial, on January 7, 2011, less than one month after her FMLA leave, Lange and Swanson suspended her pending an alleged investigation. PF ¶ 25. Defendants did not discipline, let alone suspend, Patano for viewing the file. *Id*. Instead, on January 10, 2011, while the investigation was pending, Lange and Swanson gave Patano a $5,000 raise. PF ¶ 29.

Despite claiming to undertake an investigation, it was clear that the decision to terminate Plaintiff had already been made. PF ¶¶ 26-27. On January 7, 2011, before the investigation even began and despite that Plaintiff had denied showing Patano any files, Lange recommended to Swanson and Herzog that Plaintiff be immediately terminated. PF ¶ 26 (Ex. 31, CEC-AIU 017873-17875). In response, Herzog assured Lange that nothing that Plaintiff said during the investigation would change the outcome of her immediate dismissal. *Id*. The next day, on January 8, 2011, Swanson emailed Steven Tober, Chief Executive Officer of AIU, stating, "Ann was suspended this morning and per the information below will not be comin[g] back." PF ¶ 27 (Ex. 32, CEC-AIU 006773-6774). While Lange and Herzog deny that a decision had been made

4

at this time, Swanson, the actual decision-maker, admitted in his deposition that by January 8, 2011, he had decided to terminate Plaintiff. PF ¶ 27.

During the alleged investigation, Defendants found that Plaintiff's user account had accessed the accrued bonus file on two separate dates, December 14 and December 22, 2010. PRDF ¶ 62. Plaintiff had authority to access that file and needed to do so for business reasons. PF ¶ 24 (Ex. 29, CEC-AIU 017935-17936). Regardless, Plaintiff could not log into her computer or the network from December 9, 2010 through December 17, 2010 after returning from leave, including on December 14th, one of the dates the file was accessed. PF ¶¶ 30-31 (Ex. 34, CEC-AIU 012056-12058; Ex. 35, CEC-AIU 017161-17163). Lange, Herzog and IT all knew about Plaintiff's inability to log in. PF ¶ 31 (Ex. 34, CEC-AIU 012056-12058; Ex. 35, CEC-AIU 017161-17163). Additionally, IT had sent Plaintiff's password to Patano the morning of December 14th before the file was accessed. PRDF ¶ 56. Lange and IT knew that and were also aware that Patano could have accessed the file on his own. PF ¶¶ 32-33; PRDF ¶¶ 56-57. However, Lange, Herzog, and IT never bothered to investigate whether Patano, himself, had accessed the file using Plaintiff's password. PF ¶ 32.

On January 21, 2011, only six weeks after Plaintiff's FMLA leave, Lange and Herzog terminated Plaintiff for inappropriately accessing the bonus file without having a business reason to do so. PF ¶ 38.

## Argument

Summary judgment in employment discrimination cases must be approached "with added rigor" because "credibility and intent are crucial issues." *Courtney v. Biosound, Inc*., 42 F.3d 414, 418 (7th Cir. 1994). Summary judgment is appropriate only when there are no genuine issues of material fact. Fed. R. Civ. P. 56(c). The Court must consider the facts in the light most

5

favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**I.      Plaintiff was "disabled" and engaged in "protected activity" under the ADA**.

      **A.      Plaintiff's uterine fibroids and surgery to remove them disabled her**.

Defendants' argument that Plaintiff was not "disabled" under the ADA holds no merit. An individual is "disabled" if she has a physical impairment that substantially limits her in one or more major life activities, including "reproductive functions." 42 U.S.C. § 12102(1)(A)-(2)(B).

In this case Plaintiff's doctor testified that her uterine fibroids prevented her from becoming pregnant. PRDF ¶ 16; PF ¶ 2. That, alone, shows that Plaintiff was eligible for the protections of the ADA.

Next, Plaintiff's surgery and accompanying pain disabled her. Defendants argue that conditions lasting fewer than six months are not "substantially limiting;" however, the ADA and EEOC Regulations state otherwise. 42 U.S.C. § 12102(4)(D); 29 C.F.R. § 1630.2(j)(1)(ix) ("effects of an impairment lasting . . . fewer than six months can be substantially limiting"). "An impairment need not prevent, or significantly or severely restrict . . . a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii).

Plaintiff's surgery and resulting pain substantially limited her in a number of major life activities, including procreation, walking, standing, bending, lifting, sleeping, extended sitting, concentrating, caring for herself, and working. PF ¶¶ 7-10; 42 U.S.C. § 12102(2)(A)-(B). Dr. Karande testified that the procedure was "major surgery," during which he cut open Plaintiff's abdomen, removed her uterus, cut into the uterus and shaved out the fibroid tumors. PF ¶ 7. After that, he sutured her abdomen. *Id*. This major procedure required that Plaintiff stay in the hospital for two days. PF ¶ 8. Plaintiff testified that she suffered "major abdominal pain" after

the surgery that caused her "difficulty walking up and down stairs" such that her husband had to bring the mattress down so that Plaintiff could sleep on the first floor of their home. PF ¶ 10. She testified that the pain caused her "trouble sleeping," and "getting in and out of bed," "difficulty walking," and so much difficulty going to the bathroom, bathing, and dressing that she needed assistance. *Id*. She testified that initially the pain prevented her from performing even the simplest daily tasks such as "bending over and trying to put on [her] shoes, being able to brush [her] hair," and emphasized that she "couldn't lift [her] arms, it was so painful." *Id*.

In *E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635, 640 (7th Cir. 2010), the Court reversed summary judgment on the plaintiff's ADA claim, finding plaintiff was substantially limited in "caring for himself" where he needed one to three weeks of leave and assistance dressing, bathing, brushing his hair, tying his shoes, and brushing his teeth during back pain flare-ups. Those facts are directly on par with this case, and for that reason, Plaintiff's claims must stand.

### B. Plaintiff's request for accommodation was protected activity under the ADA.

Disregarding Seventh Circuit precedent and citing no case law whatsoever, Defendants argue that a request for accommodation is not protected conduct under the ADA. The Seventh Circuit has found, however, that an employee's good faith request for a reasonable accommodation is "protected activity" for purposes of the ADA's anti-retaliation provision. *Cassimy v. Bd. of Educ. of Rockford Pub. Schools, Dist. No. 205*, 461 F.3d 932, 938 (7th Cir. 2006) (good faith request for accommodation constitutes statutorily protected expression under ADA). The parties do not dispute that Plaintiff requested the reasonable accommodation of six weeks of FMLA leave for her surgery, and that Defendants granted that request. DF ¶ 23; PF ¶ 6 (Ex. 14, Willis 00251-254; Ex. 15, Willis 00259). Consequently, Plaintiff warrants coverage under the ADA's anti-retaliation provision.

## II. Plaintiff can present a plethora of evidence under the direct method of proof from which a jury could infer discrimination and retaliation.

As a preliminary matter, Defendants claim that the decision-makers did not know about Plaintiff's disabling conditions. However, Defendants admit that "Plaintiff informed Lange that she needed surgery to remove her uterine fibroids and would be off of work." DF ¶ 18; PF ¶ 3. Additionally, Swanson testified that he knew that Plaintiff took FMLA leave to undergo surgery for "fibroids." PRDF ¶ 76. Hence, Defendants cannot now deflect knowledge.

### A. Plaintiff can present a *prima facie* case under the direct method of proof.

Defendants contend that Plaintiff cannot create a triable issue that her suspension and termination were motivated by her disabling conditions or her taking of FMLA leave under the direct method of proof. Yet, the wealth of evidence from the record shows otherwise.

Under the direct method of proof, a plaintiff can prevail on her ADA and FMLA claims by offering a convincing mosaic of circumstantial evidence from which a jury could infer discrimination or retaliation. *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 737 (7th Cir. 1994) (plaintiff may prove discrimination under the direct method through "ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence . . . together composing a convincing mosaic of discrimination"). Here, the mosaic takes many forms.

First, the record is replete with negative comments from Lange and Swanson about Plaintiff's leave. Lange admitted feeling "upset and frustrated" because of the long hours she had to work in Plaintiff's absence and blamed Plaintiff's FMLA leave for causing her "undue stress" and disrupting her "lifestyle." PRDF ¶ 39. Lange also told at least one employee that she believed Plaintiff's uterine fibroid surgery was "minor;" and told another that she believed Plaintiff's leave was "just too long," that she "didn't think that [Plaintiff] needed this leave,"

8

"didn't believe that [the leave] was either warranted or necessary," and that it would be "no great loss" and Plaintiff "wouldn't be missed" if she did not return from leave. PF ¶ 14. These comments, alone, would allow a reasonable jury to find in Plaintiff's favor. *Hasan v. Foley & Lardner, LLP*, 552 F.3d 520, 529 (7th Cir. 2008) (reversing summary judgment and holding that comments toward protected employees is evidence supporting an inference of discrimination).

Defendants argue that Lange's comments show only that she was upset with Plaintiff's notice regarding her inability to return from leave early not with her taking of leave itself, but that is a question of fact for a jury to decide. Plaintiff told Lange that her leave could last "two to six weeks" and HR had already approved her for six weeks of leave. PF ¶¶ 3, 6 (Ex. 15, Willis 00259). Plaintiff hoped she could return before the six weeks, but, each time she tried, she realized the pain was too much and emailed Lange accordingly. PF ¶ 13; PRDF ¶¶ 43, 45.

Similarly, Swanson, the decision-maker, made his own share of negative comments about Plaintiff and then tried to terminate her while she was on her leave. PF ¶¶ 15-16. On November 29, 2010, Swanson sent an email to Lange and Herzog in which he called Plaintiff "very disrespectful" and then asked for permission to "post her job" and start searching for her replacement. PF ¶ 15 (Ex. 22, CEC-AIU 005270-5271). In this email, Swanson said he had a gut feeling Plaintiff would not come back and that even if she did he anticipated "more problems" from her down the road. *Id*. In the three years before her leave, Plaintiff never had any problems, whatsoever, and had always been rated well. PF ¶ 1. Clearly, the only "problems" Swanson anticipated was more leave.

If Swanson did not make his discriminatory and retaliatory intentions sufficiently clear on November 29, 2010, he certainly foreclosed any ambiguity in his December 7, 2010 discussion planner. In the planner, Swanson encouraged Lange to hold Plaintiff "more accountable for 1)

9

the amount of work she misses, 2) the manner in which she communicates these absences, and 3) her responsibility to Kathy's team and the school – acknowledging the impact of [sic] her absences have on Kathy's quality of life." PF ¶ 16 (Ex. 24, CEC-AIU 011357-11362). Swanson then set forth a systematic approach to reprimand Plaintiff for taking FMLA leave: "Kathy has shared with my [sic] how disruptive this has been, and I know she's worked long hours making up for both Ann and Susan being out on maternity leave, so she's obviously upset, frustrated and concerned about the issue. My focus will be on 1) helping Kathy document the facts, 2) supporting her confronting Ann, 3) creating a plan on when and how to handle the meeting, and 4) discussing a plan to keep this from happening again." *Id*. In his deposition, Swanson admitted that he wanted Lange to hold Plaintiff accountable for the amount of work she missed. PF ¶ 16. Upon reviewing this planner, Herzog stated the obvious, expressing concern that Swanson and Lange were reprimanding Plaintiff for taking medical leave, a conclusion that a jury could reach as well. PF ¶ 17 (Ex. 25, CEC-AIU 011439-11440).

Second, further building on her mosaic, Plaintiff testified that the day after she returned from leave, Lange met with her and "admonished [her] for taking time off to have surgery," told her that she was unhappy that she had taken six weeks off of work, that she was unhappy with her communication of her absences during leave, and that she had decided to give Patano a majority of her responsibilities. PF ¶ 20. Lange ended the meeting by warning Plaintiff that reductions in force would take place in January. *Id*. Lange then forced Plaintiff to train Patano to do what used to be her job. PF ¶ 21. Defendants deny all of this, but such denials only underscore the issues of fact in this case that require jury resolution.

Third, the suspicious timing of Plaintiff's suspension and termination (all occurring within six weeks after her return from leave) coupled with Plaintiff's spotless record prior to her

leave, is another compelling piece of this mosaic and could serve, by itself, to defeat summary judgment. *See Sanchez v. City of Chi.*, 2007 WL 647485 (N.D. Ill. 2007) (denying summary judgment where termination came a few weeks after protected activity); *Sylvester v. SOS Children's Villages Ill., Inc.,* 453 F.3d 900, 905 (7th Cir. 2006) (suspicious timing of discharge after history of positive performance constituted circumstantial evidence of retaliation).

Fourth, the flawed nature of the investigation is also evidence of discrimination and retaliation and creates another issue of fact for the jury. Lange, Swanson, and Herzog decided to terminate Plaintiff even though Plaintiff denied ever showing Patano any files and before HR and IT even investigated the accusations. PF ¶¶ 22; 26-27. On January 7, 2011, before the investigation commenced, Lange advocated for Plaintiff's immediate termination. PF ¶ 26 (Ex. 31, CEC-AIU 017873-17875). Herzog assured Lange that nothing Plaintiff said during the investigation would change the outcome of immediate dismissal. *Id.* And, Swanson, the decision-maker, admitted that by January 8th (one day after the investigation had begun), he had already decided to terminate Plaintiff, as was evidenced by his email to Steven Tober stating, "Ann was suspended this morning and per the information below will not be comin[g] back." PF ¶ 27 (Ex. 32, CEC-AIU 006773-6774). In *Lerman v. Turner*, 2013 WL 4495245 at *13 (N.D. Ill. Aug. 21, 2013), the Court denied summary judgment on a tenured professor's discrimination claims, finding that the timing and approach of the investigation into whether the professor mishandled grant money suggested pretext where issues of fact existed as to whether the decision to terminate professor had been made prior to the investigation. The same is true in this case.

**B.  Plaintiff need not rebut Defendants' proffered reasons for the termination.**

Once a plaintiff offers sufficient evidence under the direct method of proof, the Court's examination should stop there and the case should go to a jury. The Seventh Circuit has made

clear that once enough evidence is offered under the direct method of proof, such an offering is sufficient to thwart summary judgment without the plaintiff having to cast any pretextual doubt on the employer's alleged non-discriminatory reason. *Diaz et al. v. Kraft Foods Global, Inc.*, 653 F.3d 582, 588 (7th Cir. 2011) (reversing summary judgment, holding that "[u]nder the direct method of proof, the plaintiffs are not required to rebut a defendant's non-discriminatory reason for the adverse employment action" because, although such a rebuttal may be appropriate at trial, it is not appropriate at the summary judgment stage). As such, because of the ample circumstantial evidence Plaintiff has offered above, this Court need not even address Defendant's alleged non-discriminatory and non-retaliatory reasons for termination.

   **C.**  **Although not necessary at this stage, Plaintiff can establish pretext.**

Plaintiff may prove pretext by showing that the articulated reason for the discharge had no basis in fact, did not actually motivate her discharge, or was insufficient to motivate her discharge. *Velasco v. Ill. Dept. of Human Serv.*, 246 F.3d 1010, 1017 (7th Cir. 2001).

Defendants first contend that the evidence of Lange's hostility toward Plaintiff should not matter because Lange did not influence the termination decision. However, fact issues preclude summary judgment on this point where the testimony and documentary evidence show Lange recommended and advocated for Plaintiff's termination. PF ¶ 26; PRDF ¶ 74, (Ex. 31, CEC-AIU 017873-17875).

Regardless, even if Swanson made the termination decision all by himself, there is ample evidence that the reason he gave is pretextual. Swanson testified that he decided to terminate Plaintiff "after it was brought to light that she had accessed sensitive employee files and had shared those with others inside the company." PF ¶ 28. Plaintiff testified that Herzog told her the same—that she was being terminated "for accessing the bonus file inappropriately and not

having a business reason . . . ." PF ¶ 38. Plaintiff can easily cast pretextual doubt on Swanson's reason because of the flawed nature of the investigation into the accusations. *See Lerman*, *supra*.

Defendants must have realized that this initial reason for termination held no weight because now, relying on declarations inconsistent with Swanson's and Herzog's deposition testimony, they claim that Plaintiff was also terminated because she used a flash drive to work from home, because she "refused to sign an attestation," and because she was "untruthful" during the investigation. (D's Memo in Support p. 2-3; Swanson and Herzog Declarations). These shifting justifications demonstrate pretext. *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 678 (7th Cir. 2003) (shifting explanation for adverse action, alone, may be enough to preclude summary judgment). Nevertheless, each of these reasons is unworthy of credence.

First, Plaintiff can show that none of Defendants' additional, eleventh-hour reasons motivated her discharge because Swanson had decided to terminate her before any of these additional reasons came to light. PF ¶ 27 (Ex. 32, CEC-AIU 006773-6774).

Second, no one told Plaintiff that her possession of a flash drive had anything to do with her termination, and during his deposition, Swanson said nothing about the flash drive being a reason for the termination. PF ¶¶ 28; 38.

Third, Defendants' own policies allowed Finance employees to copy and take financial and student information off premises to work from home, which everyone did. PF¶¶ 35-36; PRDF ¶ 10 (Ex. 38, Willis 00487-488). Further, Lange and Herzog both admitted that Plaintiff's use of the flash drive did not harm Defendants. PF ¶ 37.

In throwing all of these additional reasons for termination against the summary judgment wall, Defendants are hoping that something will stick. However, these additional reasons hold no weight and, moreover, cast strong pretextual doubt on Defendants' position.

13

### III. Plaintiff can establish a triable IIED claim.

#### A. Plaintiff's IIED claim is not preempted by the Illinois Workers' Compensation Act.

Despite Defendants' contention, the Illinois Workers' Compensation Act does not preempt Plaintiff's IIED claim because that Act's exclusivity provision does not apply to intentional torts committed by an employer, such as IIED. *Senesac v. Employer's Vocational Resources, Inc.*, 754 N.E.2d 363, 373 (Ill. App. 1st Dist. 2001).

#### B. A jury could find that Defendants' conduct was "extreme and outrageous" and Plaintiff suffered severe emotional distress.

Defendants incorrectly claim that Plaintiff cannot offer evidence that their conduct was extreme and outrageous. Conduct may rise to a level of "extreme and outrageous" where the defendants know that a plaintiff remains peculiarly susceptible to emotional distress due to some physical condition. *McGrath v. Fahey,* 533 N.E.2d 806, 811 (Ill. 1988). Lange knew that Plaintiff was peculiarly susceptible to emotional distress as a result of her recovery from surgery and even noted that to Swanson in her December 9, 2010, discussion planner: "Ann is sensitive and I need to be empathic about her current situation and recovery from surgery." PF ¶ 19 (Ex. 27, CEC-AIU 005362-5366). Nonetheless, one day after Plaintiff's return, Lange proceeded to admonish Plaintiff for taking leave, threaten her job, and then shift Plaintiff's responsibilities to Patano. PF ¶ 20. Then, as set forth above, Lange and Swanson subjected Plaintiff to a sham of an investigation even though Swanson testified that he had already decided to terminate Plaintiff and even though everyone knew Plaintiff did not have access to her computer on one of the days the file was supposedly accessed. PF ¶¶ 27, 30-31 (Ex. 32, CEC-AIU 006773-6774; Ex. 34, CEC-AIU 012056-12058; Ex. 35, CEC-AIU 017161-17163). A jury could easily find that such conduct rises to "extreme and outrageous." Compare these facts to those in *Naeem v. McKesson*

14

*Drug Co.*, 44 F.3d 543 (7th Cir. 2006), in which the Court affirmed a finding of "extreme and outrageous" conduct where defendants created impossible deadlines for a pregnant employee, imposed obstacles to her performance, and sabotaged her work before terminating her.

Plaintiff has also presented evidence that she suffered "severe emotional distress." Plaintiff's distress satisfies "severity" if she had to obtain psychological care because of defendants' actions. *Doe v. Calumet City*, 641 N.E.2d 498, 508 (Ill. 1994). During the sham investigation, Plaintiff sought psychological treatment for anxiety and depression and was prescribed and took antidepressants to alleviate these conditions. PF ¶ 39 (Ex. 37, Willis 00555-556). Given these facts, a jury could easily determine that Plaintiff suffered severe emotional distress.

## Conclusion

For all of these reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety.

    Respectfully submitted,

    ANN WILLIS

    By: /s/ *Kristin M. Case*
    One of Plaintiff's Attorneys

Kristin M. Case
Kate Sedey
Kendra L. Kutko
The Case Law Firm, LLC
250 South Wacker Dr., Suite 230
Chicago, Illinois 60606
Telephone (312) 920-0400
Facsimile (312) 920-0800

## **CERTIFICATE OF SERVICE**

      The undersigned attorney hereby certifies that she caused a true and accurate copy of the foregoing Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment to be served via Email on March 28, 2014 upon the following counsel of record:

        Laura A. Lindner
        Kathryn E. Siegel
        Littler Mendelson, P.C.
        321 N. Clark St., Ste. 1000
        Chicago, Illinois 60654


                                              By:   /s/ Kendra L. Kutko
                                                        Kendra L. Kutko


Kristin M. Case
Kate Sedey
Kendra L. Kutko
The Case Law Firm, LLC
250 South Wacker Dr., Suite 230
Chicago, Illinois 60606
Telephone (312) 920-0400
Facsimile (312) 920-0800