# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANN WILLIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 C 07662 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| CAREER EDUCATION CORPORATION, | ) | |
| AMERICAN INTERCONTINENTAL | ) | |
| UNIVERSITY, and KATHRYN LANGE, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Ann Willis alleges that her former employer wrongfully investigated, suspended, and terminated her for having a disability and taking a medical leave of absence to which she was legally entitled. Based on these adverse actions, she asserts claims of discrimination and retaliation under the Family and Medical Leave Act ("FMLA") and the Americans with Disabilities Act ("ADA"), as well as a common-law claim of intentional infliction of emotional distress ("IIED"). The defendants move for summary judgment, and for the reasons that follow, the motion is granted in part and denied in part. Willis may proceed with her retaliation and tort claims.

# FACTS[1]

Willis worked as a Senior Financial Analyst for American Intercontinental University ("AIU"), an online university, from April 2008 until her termination in January 2011. AIU is "indirectly owned" by Career Education Corporation ("CEC").[2] Answer, Dkt. # 25 ¶ 6. For the duration of her employment, Willis reported to defendant Kathy Lange, the Vice President of Finance. Beginning in April 2010, Willis shared duties with another Senior Financial Analyst, Susan Zaleski. And the Fall of 2010, accounting employee Frank Patano began working part-time in the Finance Department, "so the Analysts could focus more on data analysis than data collection."

Willis was trying unsuccessfully to conceive a child for at least one year before September 14, 2010. On that date, Willis consulted with Dr. Vishvanath Karande, who diagnosed her with fibroids in her uterus. Dr. Karande recommended that Willis have surgery to remove the fibroids, which were preventing her from becoming pregnant. Willis also had heavy, painful menstrual periods caused by the fibroids, and she occasionally missed work as a result.

On September 20, 2010, about a month into the Finance Department's busy budget season of August to December, Willis informed Lange that she needed surgery and would miss work for possibly two to six weeks. Willis did not yet have the surgery scheduled, and as of October 13, 2010 (in response to Lange's inquiry as to whether Willis would be able to attend a

---

[1] The summary of material, undisputed (or not properly disputed) facts is drawn from the parties' statements and responses pursuant to Local Rule 56.1, and the facts and reasonable inferences therefrom are construed in favor of Willis, the non-moving party. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 503-504 (7th Cir. 2014); *Senske v. Sybase, Inc.*, 588 F.3d 501, 503 n.1 (7th Cir. 2009) (facts are properly disputed only with citations to evidence that directly contradicts opponent's assertions).

[2] In their answer the defendants deny that CEC was Willis's employer. Answer, Dkt. # 25 ¶ 4. The summary judgment motion does not seek judgment for CEC on that basis. For the sake of simplicity the court refers to Willis's employer as AIU.

baby shower for Zaleski), Willis could only tell Lange that the hospital had "indicat[ed] the last week of the month." On October 19 or 20, Lange met with Willis for her mid-year performance review, at which Lange told Willis that her performance was "on track," that she was a "team player," though noting that she could improve on the timeliness of her completion of work.

Later that day, Willis informed the Human Resources department that she would be taking FMLA leave at the end of the October; she requested and received the necessary paperwork, and on October 21, 2010, the hospital scheduled her surgery for October 29. She then confirmed with HR Generalist Amy Zorica that her leave would begin on October 27 to account for per-operative testing. But Willis did not tell Lange the precise date of her surgery and the start of her leave until late on October 25, after Lange had emailed Willis about work she needed to do on the budget. Upon learning that Willis's absence was imminent, Lange informed Human Resources and asked what her (Lange's) responsibilities were regarding Willis's impending leave. Lange then learned that Zorica was already aware of the leave and had not discussed it with Lange because Zorica believed that Lange, too, was aware of the dates Willis would be out. Willis complied with the Human Resources procedures for FMLA leave and did not violate any written AIU policy by not informing her supervisor about her leave sooner.

Lange forwarded her email exchange with Zorica to her supervisor, Nate Swanson, the Senior Vice President of Finance & Administration, stating that Willis "did have a conversation with [Zorica] last week" and that "[j]ust to clarify, [Lange] knew the general time frame of when [Willis] would be out but the specific date hadn't been set." Lange wanted Swanson to know she would be short-staffed during the busy budget season.

On October 29, 2010, Willis had successful surgery to remove her fibroids. On November 2, AIU received a fax of Willis's FMLA Certification of Health Care Provider form

prepared by Dr. Karande. The form stated that Willis "will not be able to work for approx. 6 weeks" and that she "is having major [abdominal] surgery." Willis was approved for six weeks of medical leave. However, Willis hoped that she would be able to return to work sooner.

Willis took prescription pain medication for about three weeks after the surgery. At her follow-up appointment with Dr. Karande on November 9, she reported that she still had major abdominal pain, which the doctor regarded as normal following her surgery. A treatment note from that appointment contains the statement that Willis "should be able to resume most of her normal activities without limitation." Dr. Karande elaborated at his deposition that Willis did not have any complaints that were inconsistent with what could be expected for major abdominal surgery, but that she was suffering pain consistent with her surgery and had no "unusual" or worrisome complaints. He related that two to six weeks off is "routine" for surgery that involves opening the abdomen, as patients have trouble commuting to and from work and concentrating on work tasks because of pain. In Willis's case, her extreme pain following surgery resulted in difficulty walking, going up and down stairs, and sleeping. She also had trouble concentrating, sitting, lifting, and bending, and she was not able to resume her normal work activities.

On Sunday evening, November 14—some two weeks into her medical leave—Willis emailed Lange to state "I expect to return to work on 11/29." Lange, who had expected Willis to return on November 15[3], forwarded this email to Swanson, writing only "I'm not surprised." Swanson inquired when Willis had "gone out," and Lange told him that the leave began on October 27.

_____

[3] The defendants do not say *why* Lange believed Willis would return on November 15. In their Statement of Facts at ¶ 26 they refer to an email from Willis stating she would be out "for about 2 weeks" returning "mid-November," but they do not say that *Lange* received any such email, and the defendants failed to provide a copy of what they label "Willis Ex. 18." The plaintiffs admit that Willis emailed one person—a Brian Van Kleeck—and said that she expected to be out for approximately two weeks.

On November 29, at 7:15 a.m., Willis again emailed Lange, stating that she had thought her return to work date would be November 29, but that "due to the nature of the surgery & recovery of time the doctor will release me to work on 12/9." Lange again forwarded the email to Swanson, stating only: "I guess what kind of irks me is that she never once said she could potentially be off for six weeks if the surgery did not go well." Swanson replied to this email, copying Nicole Herzog, AIU's Human Resources Director, and stated: "That and I'm pretty sure she knew about this before 7:15 am this morning. Very disrespectful on her part to consistently wait until she's expected to be here and then not show up." He went on to state: "Nicole—Can we start a search for a replacement/add to staff since Susan is going to be out for another 2½ months? My concern is that Ann doesn't come back at all – my gut tells me this is a likely scenario. And even if she does come back, I anticipate more problems down the road." In her reply, Herzog stated "we're a little more limited with respect to replacing her in her current role" if Willis "is still FMLA protected."

Willis's FMLA leave overlapped with the maternity leave of her co-worker, Susan Zaleski. Therefore, Lange was left to do the work of three people during much of the budget season. Lange felt "upset, frustrated, and concerned" by her long hours of work, and found the situation disruptive to her life. She believed she was placed under "undue stress," which she attributed to handling the workloads of two additional people. During Willis's leave, Lange at least once referred to Willis's surgery as "minor," and she made comments to her counterpart in the accounting department, Meribeth Masters, that were "along the lines" of Willis "milking" her FMLA leave or her "prolonged" absence being unwarranted or unnecessary. Masters did not remember the specific words of the comments.

On December 7, 2010, Swanson emailed Herzog for her review of a "discussion planner" he had drafted for an anticipated conversation between Lange and Willis upon Willis's return. The planner encouraged Lange to hold Willis "more accountable for 1) the amount of work she misses, 2) the manner in which she communicates these absences, and 3) her responsibility to [Lange's] team and the school—acknowledging the impact of her absences have on [Lange's] quality of life." In response, Herzog cautioned that they needed "to be careful not to make [Willis] feel like she is being reprimanded for being out on medical leave, which is her right, but focus more on the communication (or lack thereof) between her and [Lange] re: her return to work." Also on December 7, in connection with her regular duties, Lange drafted a document that proposed a reduction of an employee from either the Finance or Accounting departments.

Willis returned to work on December 9 and provided a return-to-work form that had been signed and dated by her doctor's office on November 17.[4]  On December 10, Lange met with Willis and discussed, among other topics, her frustration with the way Willis had communicated with her during Willis's leave. Lange had drafted her own "discussion planner" to work from; it stated in part that Willis should have informed Lange "early on" that her expected return to work would be extended and that Lange was "sure [Willis] was well aware that her recovery time would surpass the 3 weeks she had originally communicated."  At the end of this meeting, Lange also told Willis that the company would undergo a reduction in force in January 2011.  Lange did not say that the finance and accounting departments would be affected or that Willis's position would be eliminated. Willis's impression of the December 10 conversation was that she had been admonished for taking time off and for how she had communicated about it, and that the reference to a reduction in force was a threat to her job. Around the same time, Lange

---

[4] Again the defendants cite an exhibit, "Willis Ex. 31" that they did not place in the summary judgment record, *see* Def. SOF, Dkt. # 61 ¶ 49, but the plaintiff does not dispute it.

encouraged Willis to work with Frank Patano on dividing their work, which entailed Willis training Patano on some tasks that were formerly assigned to her.

Shortly after Willis returned to work, Lange took a two-week vacation. During her absence, on December 14, 2010, Willis called for technical support because she could not log in to her computer. The IT department left her a voicemail with a new password and also emailed it to Willis's co-worker, Patano, at Willis's request. Willis did not think she had to change the generic password she was given and IT did not prompt her to do so. Willis testified that she was unable to log in to her computer or the defendants' network from December 9, 2010, through December 17, 2010.

On January 6, 2011, Patano spontaneously approached Lange and confessed that on December 22, 2010, a date on which Lange had been out of the office, Willis showed him confidential salary data for AIU employees. Patano stated that Willis told him he was underpaid and should be making more money, and also commented that Susan Zaleski was making $1000 more than Willis. After Lange relayed this information to Swanson, she, Swanson, and Herzog met with Patano, who again stated that Willis had shown him employee compensation and bonus information and told him that he was underpaid. Patano later emailed Herzog his account of his December 22 conversation with Willis about compensation. In the email he stated that he was reporting the information "as a confession on my part" because he "felt guilty."

On January 7, 2011, Herzog and Lange held a meeting with Willis at which Herzog told her that it had been brought to their attention that Willis had shared AIU's "bonus file" with Patano. They did not elaborate on what they meant by "bonus file," and Willis believed that they were referring to "staffing sheets," and not the accrued-bonus or "compensation file" that Herzog intended to reference. Willis denied accessing the file or sharing the data with Patano. Willis

denied all of Patano's allegations and was "shocked" and "flabbergasted" because they "came out of left field." After the meeting, Willis was suspended with pay pending an investigation into her conduct.

The next day, January 8, Swanson explained in an email to AIU's CEO, Steven Tober, that Willis had been suspended and "will not be comin[g] back." Swanson confirmed in his deposition that by January 8, 2011—the day after alerting Willis to Patano's allegations—he had already decided to terminate Willis.

Nevertheless, the investigation proceeded under Swanson's supervision. AIC designated Sergio Siguenza, the Director of Security Response, to investigate whether Willis had accessed the "compensation file," or accrued bonus file. He confirmed that someone using Willis's user credentials had accessed that file on December 14 and three times on December 22 and that no one using Patano's credentials had done so. Patano did not have access to the file on his computer or with his own credentials. Siguenza did not, however, investigate whether Willis personally had opened the files. The IT Department gave Siguenza the work request "tickets" Willis had submitted regarding her connectivity problems. Although it was theoretically possible that Patano could have accessed the accrued compensation file using Willis's credentials, no one inquired whether he had done so. During his investigation, Siguenza also noted that Willis had saved a number of documents containing sensitive or confidential student data to a portable USB drive ("flash drive").

Lange emailed Swanson and Herzog and told them that IT found that Ann "had access [sic] the file 6 times since 12/14." Herzog stated that she would call Willis the next day and give her "one more opportunity to come clean." Lange responded that even if Willis admitted accessing the data, "it shouldn't change the outcome of immediate dismissal, right?". Herzog

replied that it "will not change our decision" but that it was worthwhile to give Willis the opportunity to "admit, therefore, acknowledging that she was not honest in the first place."

On January 11, 2011, Herzong held a conference call with Willis, Lange, Swanson, and Siguenza. Herzog explained that they had discovered a number of files accessed and saved by Willis to a flash drive that included sensitive student data including social security numbers. Herzog explained that having files on personal drives violated both AIU policy and applicable confidentiality laws including FERPA. Willis admitted that she had frequently saved files to flash drives and taken them home during her employment with AIU. Finance Department employees had always been permitted to take files home for the purpose of working from home. Willis believed that both Lange and the IT knew that she used a flash drive to work from home. All Finance employees, including Lange, occasionally worked from home, and Lange allowed them to take files off company premises for that purpose without her specific authorization. Willis never shared or misused the files on her flash drive.[5]

Willis was asked to sign an attestation that, among other things, she did not currently have in her possession "any confidential information belonging to AIU, in electronic, physical or any other format" and to affirm that "any AIU files containing confidential information that [she] may have previously held in [her] personal possession, whether in electronic, physical or any other format, have been destroyed or deleted or returned." Willis requested some revisions to the attestation, including adding the phrase "other than as has been necessary to perform my essential job functions" in front of the assertion that she had not "disseminated or disclosed any such confidential information to any other persons or entities, either employed with or outside of AIU." Although AIU made the change, Willis declined to sign the statement.

---

[5] Defendants admit this fact for purposes of summary judgment.

In a January 14, 2011, phone call, Herzog informed Willis that the investigation had found that she had accessed the so-called "compensation file," to which Willis replied that she "had access to" that file. Herzog viewed this as a contradiction of Willis's previous statement that she had not looked at the "bonus file" and did not know where to find it.

When the investigation concluded, Swanson consulted with AIU's legal counsel and with Herzog and decided to proceed with firing Willis. Herzog telephoned Willis on January 21 to tell her she was terminated effective immediately for inappropriately sharing confidential data from the bonus file. Nothing about taking files home on a flash drive was mentioned during this conversation, nor was there any discussion of Willis's refusal to sign the attestation. Patano was not suspended; the discipline he received was limited to a "coaching conversation" about his conduct and a restriction of his access to certain files. He also received a planned pay raise that went into effect on January 10.

According to Willis, she never showed Patano confidential salary data, told Patano that she was underpaid relative to Susan Zaleski (whose salary Willis says she did not know), or told Patano that he should be making more money. Before Willis took her medical leave, her job performance had always been viewed as adequate.

After her termination, Willis timely filed an administrative charge of discrimination and retaliation with the EEOC, which made no findings based on its investigation and issued a right-to-sue notice on June 28, 2012. Willis then timely filed this lawsuit. The operative First Amended Complaint alleges that defendants AIC and CEC discriminated and/or retaliated against Willis for exercising her right to medical leave under the FMLA (Count I); discriminated against her based upon a disability in violation of the ADA (Count II); retaliated against her for requesting reasonable accommodation of her disability (Count III); and, with defendant Lange,

intentionally inflicted emotional distress on her (Count IV). The defendants collectively move for summary judgment on all counts.

## DISCUSSION

Summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding the motion, the Court examines the record in the light most favorable to the non-moving party, resolving all evidentiary conflicts in her favor and according her the benefit of all reasonable inferences that may be drawn from the record. *Coleman v. Donahoe*, 667, F.3d 835, 842 (7th Cir. 2012). "[T]he opponent of summary judgment need only point to evidence that can be put in an admissible form at trial, and that, if believed by the fact-finder, could support judgment in [her] favor." *Marr v. Bank of America, N.A*., 662 F.3d 963, 966 (7th Cir. 2011).

In Count I, Willis labels the theory of her FMLA claims as "discrimination / retaliation" (Count I). The statute prohibits "interference" with the exercise of FMLA rights, 29 U.S.C. § 2615(a)(1), "discriminat[ion]" against any individual "for opposing any practice made unlawful by this subchapter." *id*. § 2615(a)(2), and "discriminat[ion] against any individual because such individual--(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter; (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter," *id*. § 2615(b). Despite the textual references to "discrimination," the courts have generally characterized the two types of FMLA claims as interference and retaliation. *See Pagel v. TIN Inc*., 695 F.3d 622, 626 (7th Cir. 2012).

("Employers are prohibited from both interfering with . . . and retaliating against . . . an employee's use or attempted use of FMLA leave."). An interference claim has the following elements: (1) the employee was eligible for FMLA protections; (2) her employer was covered by FMLA; (3) she was entitled to take leave under FMLA; (4) she provided sufficient notice of [his] intent to take leave; and (5) her employer denied her FMLA benefits to which he was entitled." *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010). The Court does not understand from the facts and from the parties' arguments that Willis claims she was denied FMLA benefits; she was provided with her requested medical leave and reinstated to her position upon its expiration. Therefore, although Willis refers to both discrimination and retaliation under the FMLA, her sole FMLA claim is that she was fired for taking her protected medical leave; that will be referred to as a "retaliation" claim despite the statute's use of other terminology. Under the ADA, however, Willis separately claims discrimination based upon having a disability and retaliation based upon having requested a reasonable accommodation, and those claims are factually independent of one another.

## A. Disability Discrimination

Willis claims that she was disabled and that AIU discriminated against her for that reason when it "levied accusations against [her] that she allegedly inappropriately accessed compensation documentation," "undertook a baseless investigation into such alleged conduct," and suspended and later terminated her employment. Succeeding on a claim of disability discrimination requires a plaintiff to prove: (1) she is disabled within the meaning of the ADA; (2) she is qualified to perform the essential functions of the job with or without accommodation; and (3) she suffered an adverse employment action because of her disability. *Bunn v. Khoury*

*Enterprises, Inc.*, 753 F.3d 676, 683 (7th Cir. 2014). The defendants argue that Willis lacks

evidence that she was disabled and that her discharge resulted from any discriminatory intent.

### 1. Existence of a Disability

To prove either discrimination or retaliation under the ADA, the plaintiff first must

establish that she is disabled within the meaning of the ADA. Under the ADA, a disability is "a

physical or mental impairment that substantially limits one or more major life activities," "a

record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C.

§ 12102(1); *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 606 (7th Cir. 2012). Here, the

defendants argue that Willis is not disabled within the meaning of the ADA because her fibroid

condition was not substantially limiting and her restrictions after surgery were temporary.

The defendants argue, and the Court agrees, that the record does not support Willis's

contention that uterine fibroids substantially impaired her daily activities such as walking, lifting,

sleeping, extended sitting, and caring for herself. The fibroids caused painful menstrual periods,

but no record evidence supports an inference that Willis was substantially limited as to these

activities before her surgery, even if she occasionally missed work due to discomfort. And to the

extent that Willis contends that she was disabled by her "surgery and resulting pain," Mem.,

Dkt. # 60 at 6, which undoubtedly limited her in a number of major life activities, that argument

is a red herring. Throughout her surgery and recovery, Willis was on medical leave from work

because she was unable to perform the essential functions of her job; therefore, she was not a

qualified person with a disability for purposes of ADA protection. *See* 42 U.S.C. § 12111(8);

*Byrne v. Avon Products, Inc.*, 328 F.3d 379, 381 (7th Cir. 2003). Because she cannot

simultaneously claim to have been completely unable to work and to have had an ADA-protected

disability, the restrictions she endured during her convalescence are not relevant to ADA discrimination claim.

Nevertheless, Willis still has evidence of disability because she was substantially limited in the major life activity of procreation during some of the relevant time period. Infertility, or sterility, "assuredly is a 'disability' under the ADA." *Yindee v. CCH Inc*., 458 F.3d 599 (7th Cir. 2006) (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998); 29 C.F.R. § 1630.2(h)(1)). When a condition such as cancer, or its treatment, causes infertility, the plaintiff has a disability, even if the underlying condition has been cured and no longer impairs the plaintiff. *See id*. The defendants contend that there is insufficient evidence of infertility in the record because the uterine fibroids only reduced Willis's likelihood of pregnancy, rather than eliminating it altogether. The record suggests otherwise, but, in any case, that is not the standard. The ADA speaks to "substantial limitation," and under the applicable regulations, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 CFR § 1630.2(j)(1)(ii). Here, even the defendants admit that Willis's doctor performed fibroid surgery only to increase her chances of getting pregnant; removal of the fibroids was not otherwise medically necessary. Mem., Dkt. # 56 at 4 ("her doctor testified that he removed the fibroids only because Willis was trying to get pregnant"). That is evidence enough, for summary judgment purposes, that Willis's ability to procreate was substantially limited, at least prior to her surgery, and therefore that she was disabled within the meaning of the ADA.[6] There is also Willis's testimony that she was unable to get pregnant after a year of trying and that she used infertility medication during that time.

---

[6] Federal regulations also leave no question that the uterine fibroids causing fertility challenges can satisfy the "physical impairment" and "major life activities" aspects of the "disability" definition. A "physical impairment" is "*any* . . . disorder or condition . . . affecting

14

## 2. Discrimination on Account of Disability

With little elaboration, Willis contends that AIU subjected her to adverse employment actions because of her disability. The defendants argue, however, that Willis cannot establish that she was suspended, investigated, or fired because she had fibroids, was infertile, or was otherwise substantially limited in any major life activity. Here, they are correct. Simply put, there is not a shred of evidence in the record from which a jury could reasonably conclude that Willis was fired "on the basis of" fibroids, the resultant infertility, or, indeed any perceived or actual disability.[7] *See* 42 U.S.C.A. § 12112; *Serwatka v. Rockwell Automation, Inc.* 591 F.3d 957, 962 (7th Cir.2010) (ADA "requires plaintiffs bear the ultimate burden of persuasion to show but-for causation").

There is no evidence to suggest that Swanson, the decision-maker, knew or otherwise believed[8] before Willis's leave that she had any condition—fibroids, infertility, or any other—that substantially limited her in any major life activity. Therefore, during most of the pre-surgery period in which Willis was arguably a qualified person with a disability within the meaning of the ADA, Swanson was unaware of any disability, and, in any event, no adverse actions were taken during that time. When Willis was out on medical leave, she was no longer a "qualified

---

one or more body systems, such as . . . reproductive." 29 CFR § 1630.2(h). And a "major life activities" under the ADA include the "operation of major bodily function, including . . . reproductive functions." 29 CFR § 1630.2(i)(1)(ii).

[7] That is not to say that the employer's stated reasons for the termination can be credited; they might very well have been pretextual, as discussed in the context of the retaliation claims. But even if the employer's explanations were discredited entirely, there would be no basis at all in the record on which it could be reasonably inferred that Willis's disability had anything to do with her termination. *See Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010) (explaining that under direct method there must be some evidence of discrimination even if pretext is established).

[8] Willis does not argue that she was protected by the ADA because she was "regarded as" disabled; she only contends that she was in fact disabled within the meaning of the ADA because of the limitations caused by her uterine fibroids (causing infertility) and her surgical recovery.

person with a disability" because she could not work without or without accommodations; and, again, during that time, there were no adverse employment actions. The only adverse employment actions that Willis points to occurred about six weeks after her return to work on December 9, after successful surgery. There is no evidence whatsoever that, at that time, Swanson knew or believed that Willis had an impairment that limited her in any major life activity.[9] (Indeed, the evidence suggests that Swanson may have believed that Willis had recently missed work *without* sufficient need—*i.e.,* that she was malingering.) This is true even if, accepting Willis's version of the facts, she remained infertile for three months after the operation due to post-surgery restrictions. Willis does not contend or point to any evidence that this fact could have been known to Swanson (or anyone else, for that matter). *See Hedberg v. Ind. Bell. Tel. Co.*, 47 F.3d 928, 933 (7th Cir. 1995) (holding, as matter of first impression, that where there is no genuine issue that employer did not know of an employee's disability when it decided to fire him, the employee cannot prove discriminatory discharge). Therefore, she is wholly unable to establish a link between the adverse employment actions she complains and a disability, and the defendants are therefore entitled to judgment in their favor on the disability discrimination claim.

## B. Retaliation

Willis also claims that she was suspended, investigated, and fired because she took an FMLA-protected medical leave and because she requested a reasonable accommodation of her disability under the ADA (in the form of the leave of absence). ADA and FMLA retaliation

---

[9] To the extent that Swanson's reference to future "problems" with Willis could conceivably refer to absences caused by a disability, an inference of discriminatory motive cannot be drawn on that basis alone. *Hedberg,* 47 F.3d at 934 (explaining that adverse actions based on the symptoms or effects of a disability are not the same as actions taken because of disability itself).

claims are evaluated under the same standards. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) ("We evaluate a claim of FMLA retaliation the same way that we would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII.").

*1. Protected Activity*

The defendants, rightly, do not contest that Willis's acts of requesting and taking FMLA leave are protected activity under that statute. *See* 29 U.S.C. § 2615(a)(2); *Pagel v. Tin Inc.*, 695 F.3d 622, 631 (7th Cir. 2012).

They argue, however, that the act of requesting a reasonable accommodation for a disability is not protected activity under the ADA. Mem., Dkt. # 56 at 5. They contend that the ADA's "retaliation" provision, 42 U.S.C. § 12203(a), only protects individuals who have "opposed any act or practice made unlawful" by the ADA or who have "made a charge, testified, assisted, or participated" in an ADA complaint, and requesting a reasonable accommodation is neither. *See* Mem., Dkt. # 56 at 5. The defendants' argument might be technically correct as far as it goes, but the very next subsection of the statute provides that "[it] shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b). The plain import of this language is that the "exercise" of ADA rights, including the right to request reasonable accommodations, is protected. *See Brown v. City of Tucson*, 336 F.3d 1181, 1192-93 (9th Cir. 2003). The Seventh Circuit has treated § 12203(b) as an anti-retaliation provision. *See, e.g., Silk v. City of Chicago*, 194 F.3d 788, 799 (7th Cir. 1999). And it has consistently treated the ADA as protecting those who have exercised their right to request a reasonable accommodation. *E.g., Taylor-Novotny v. Health Alliance Medical Plans, Inc.*, 772 F.3d 478, 494 (7th Cir. 2014); *Hoppe v. Lewis Univ.*, 692 F.3d 833, 842 (7th Cir. 2012)

("There is no dispute that Hoppe engaged in statutorily protected activity by . . . requesting a reasonable accommodation for her disability"); *Silk*, 194 F.3d at 800 (referring to "the accommodation sought for [plaintiff's] disability, as "protected expression" under the ADA). Therefore, for purposes of this motion only,[10] the Court will treat Willis's request for time off for surgery as if it were ADA-protected activity.

### 2. Causal Connection

That leaves the question of whether the adverse employment actions that Willis undisputedly suffered were retaliation for her protected activity of requesting and taking time off of work. Willis does not invoke the indirect method of proving retaliation; therefore, the Court follows the parties' lead in evaluating whether Willis establishes retaliatory intent using the

---

[10] That Willis's ADA retaliation claim survives summary judgment does not portend that the claim is likely to succeed. While the defendants have pursued the insubstantial argument that requesting a reasonable accommodation is not protected, they have ignored the meatier argument that Willis did not engage in protected activity because six weeks of time off is not a "reasonable accommodation" under the ADA. As the Seventh Circuit explained in *Byrne v. Avon Products, Inc.*, 328 F.3d 379, 381 (7th Cir. 2003):

> The sort of accommodation contemplated by the Act is one that will allow the person to "perform the essential functions of the employment position." Not working is not a means to perform the job's essential functions. An inability to do the job's essential tasks means that one is not "qualified"; it does not mean that the employer must excuse the inability.

There is no evidence that Willis ever asked for any "accommodation" for her fibroids that would permit her to perform her job, and her request for time off is not protected under the ADA, so her ADA retaliation claim is unlikely to succeed at the end of the day. But the Court cannot grant summary judgment on a basis not raised by the defendant without giving the plaintiff the opportunity to respond (*see* Fed. R. Civ. P. 56(f)), and soliciting such a response here is not worthwhile. Looking ahead to an eventual trial, *Byrne* appears to preclude Willis from obtaining a jury instruction, or making an argument, that asking for six weeks of time off is a protected activity under the ADA.

Indeed, it appears unlikely that Willis would be entitled to a jury trial on her dubious retaliation claim in any event, because only equitable relief is available with respect to an ADA retaliation claim. *Kramer v. Banc of America Securities, LLC*, 355 F.3d 961, 965-967 (7th Cir. 2004).

direct method of proof. Under both the FMLA and the ADA, this requires her to provide sufficient evidence from which it could be concluded that her protected activity and the adverse employment actions are "causally connected." *Malin v. Hospira, Inc*., 762 F.3d 552, 562 (7th Cir. 2014) (FMLA); *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013) (ADA). Under the direct method, Willis must produce (1) evidence akin to a direct admission of retaliatory motive, or (2) a so-called "convincing mosaic" of circumstantial evidence. *Hobgood v. Ill. Gaming Bd*., 731 F.3d 635, 643 (7th Cir. 2013). "Such circumstantial evidence may include suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Greengrass v. Int'l Monetary Systems Ltd*., 776 F.3d 481, 486 (7th Cir. 2015). These are not prongs of a test, but rather non-exclusive examples of what probative evidence a plaintiff might be able to marshal. *Id*. "The ultimate question the parties and the court always must answer is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of his protected status or activity." *Hobgood,* 731 F.3d at 644.

The defendants argue that Willis has no evidence of retaliatory motive. The Court disagrees, at least as to the FMLA claim. At this stage, Willis has come forth with sufficient circumstantial evidence that she was fired because she took a six-week medical leave. That evidence includes the statements of her supervisors from which hostility toward Willis's use of medical leave could be inferred; the timing of her termination; and the possibly pretextual reason for the suspension and termination.[11]

---

[11] Whether the investigation itself can properly be considered an "adverse employment action" is not well-briefed by the parties. In the Court's view, standing alone, the fact of the investigation did not affect the material terms and conditions of Willis's employment. The investigation is relevant, however, to the extent it provided the premise of the termination, which is the quintessential adverse action.

First, some evidence of retaliatory animus can be found in the discussions among Lange, Herzog, and Swanson (the ultimate decision-maker) about Willis. Negative statements about Willis's leave and her "communication" issues around that topic could reasonably be viewed as hostility toward her protected activity. There is no need to catalogue all such statements, but by way of example, there is the evidence that Swanson wanted Lange to counsel Willis immediately upon her return from FMLA leave about "the amount of time" she took off. The fact that Herzog, the Human Relations official, responded to Swanson's discussion planner with the advice that Willis should not be reprimanded for taking medical leave underscores that Swanson appeared to be doing just that. Lange's email to Swanson stated that she was "irked" by Willis's extension of her leave beyond the time Lange expected her to be back, and Lange forwarded every discussion of Willis's leave, whether with Zorica or Willis, to Swanson with her own complaints or comments appended. And Lange also made her dissatisfaction with Willis's leave known to Ms. Masters, her peer in accounting. Swanson and Lange both considered it "disrespectful" of Willis to email about her return date shortly before the defendants (perhaps unreasonably) expected her back, and while Willis was still on leave, Swanson suggested replacing her to avoid "more problems" with her in the future. The defendants insist that only Willis's "communication" was problematic, not the fact of her prolonging her leave beyond what they expected. But a jury could reasonably view their criticisms differently, particularly where there is no dispute that Willis had been approved for six weeks of leave. The fact of the medical leave and Willis's communication about it are not so discrete that a factfinder necessarily must conclude that the defendants' annoyance was about just the latter.

The defendants insist that Swanson's statements must be interpreted according to "his explanation of the meaning." Mem., Dkt. #69 at 9. This erroneously assumes, however, that his

post-lawsuit explanations of his earlier comments are credible. The entire question in a retaliation case is whether an employer took action for an impermissible reason, and the employer's credibility is not assumed. *See Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 904-905 (7th Cir. 2006). The defendants further contend that Lange's and Swanson's negative comments do not "*point directly to* a retaliatory motive." Mem., Dkt. # 56 at 7; Mem., Dkt. # 69 at 6 (emphases in originals). The statements might not amount to a "smoking gun" that *compels* a finding of retaliation, but they are sufficient to permit a reasonable inference of a retaliatory motive when viewed in light of the other circumstantial evidence.[12]

Moreover, although it is true that Lange was not the ultimate decision-maker, it goes too far to assert, as the defendants do, that she had "no input" in the termination. *See* Mem., Dkt. # 69 at 9. Lange was included in almost every meeting, phone call, or email that addressed Willis's fate. She was Swanson's primary, if not only, source of information about what Willis had said about her leave and when; without Lange's statements, Swanson would not have believed that Willis was supposed to be out for just two weeks. She was also the one who immediately reported Willis to Herzog and Swanson after Patano's "confession." And her email to Herzog stating that the investigation "shouldn't change the outcome of immediate dismissal" could readily be interpreted as her advocating for termination. (The defendants, again, dispute how Lange's statements should be interpreted, but Willis is entitled to inferences in her favor.) Swanson's ire at Willis, moreover, was premised largely on his perception that Willis was being disrespectful of Lange. Willis has therefore laid the groundwork to prove that Lange a harbored a retaliatory animus and that her influence was a proximate cause of Swanson's decision to

---

[12] Because Swanson, the decision maker, wanted to hold Willis "accountable" for "the amount of work she misses," and while she was on a protected medical leave inquired about replacing her to prevent "more problems," and wanted Lange to "confront" her about it, the "gun" is hot even if it is not quite "smoking."

terminate Willis, even if she never expressly invokes the "cat's paw" theory of liability. *See Staub v. Proctor Hosp*., 562 U.S. 411, 131 S.Ct. 1186, 1192 (2011); *Smith v. Bray*, 681 F.3d 888 (7th Cir. 2010).

Finally, although it is not decisive in itself, temporal proximity between an adverse action and the protected activity is one piece of evidence that might suggest a retaliatory motive. *King v. Preferred Technical Group*, 166 F.3d 887 (7th Cir. 1999). Here, while discussing Willis's absence on medical leave, Swanson openly contemplated replacing her to avoid "more problems" with her in the future. And, with Swanson's knowledge and encouragement, Lange confronted Willis about her medical leave the day after she returned to work. Willis was suspended within one month of her return and then terminated two weeks later. This is sufficiently close in time to constitute some evidence of retaliatory motive. *See, e.g., Coleman v. Donahoe*, 667 F.3d at 861.

The defendants protest that they are insulated from a retaliation claim by an intervening event—namely, Patano's "confession," which occurred after Willis returned from leave, but before she was suspended. Patano's curious, unprompted report to Lange might be viewed as an independent, intervening cause of Willis's suspension, but a jury might also see it differently— namely, as a pretext for retaliation. The defendants' argument might have had more sway if Lange had not already been "irked" at Willis and Swanson had not made inquiries about replacing her before Patano came forward to unburden himself. But on these facts, a jury could conclude that Patano's confession was fortuitously timed from the defendants' standpoint, providing cover for terminating Willis for her absence during the busy season.

Willis points to plenty of evidence of pretext. Pretext—a pillar of the circumstantial case—is a showing that the defendant's explanation for the adverse employment action is not

worthy of credence because it is factually baseless, was not the actual motivation, or was insufficient to motivate the action taken. *See Carter v. Chicago St. Univ.*, 778 F.3d 651, 659 (7th Cir. 2015). The focus is on "the honesty of the employer's explanation, rather than its validity or reasonableness." *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013).

At the summary judgment stage, AIU says that Herzog and Swanson recommended or approved firing Willis because she inappropriately shared confidential bonus data with Patano, had various documents on a personal flash drive, would not attest that she was no longer in possession of AIU documents, and was untruthful during the investigation. Willis creates a permissible inference that these reasons should not be credited. First, the evidence of Willis's breach of confidentiality is, at least, ambiguous, despite the "investigation" AIU conducted. *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003). There is evidence that the investigation, which began only after Willis already was suspended, had a foregone conclusion, given Swanson's prior interest in replacing Willis and Herzog's statement to the effect that Willis was merely going to be given the opportunity to admit wrongdoing. Moreover, Swanson decided to dismiss Willis at least as of January 8, before the investigation was complete. And it was not much of an investigation, as there is no evidence of any effort to discern whether Patano had opened the compensation file with Willis's password. And AIU does not effectively dispute the evidence that Willis could not access any files on December 14, one of the days the bonus file had been opened. Given the ambiguity, a jury could conclude that AIU's explanation should not be credited.

A jury might also reasonably discount the explanation that Willis removed sensitive documents from school grounds by saving them to a flash drive, in light of evidence that Willis and other Finance Department employees occasionally brought files out of the office for the

purpose of working from home. Only Willis was subjected to discipline for that conduct, which the defendants have admitted did not cause them harm.

Pretext could also be inferred from AIU's shifting explanations for Willis's termination over time. She was told that she was fired because she accessed[13] and disclosed to Patano information from a confidential compensation file without a business reason. The defendants elaborated on their reasons over the course of discovery, and in new declarations in support of their summary-judgment motion they now cite the failure to sign the attestation and purported inconsistent statements during the investigation. The defendants' explanations are not inconsistent with each other, but "[s]hifting *or* inconsistent" explanations are indicative of pretext. *See Appelbaum*, 340 F.3d at 579. A jury might view the shifting and augmentation of the defendants' explanations over time as circumstantial evidence that the original motive was retaliatory, especially since the reasons were not communicated to Willis at the time of her termination, or in some cases, even in the defendants' depositions during this lawsuit. It is reasonable to discredit belatedly asserted explanations. *See Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 677 (7th Cir. 2003).

Viewing the evidence as a comprehensive whole and in the light most favorable to Willis, a jury reasonably could conclude based on the defendants' statements, the timing of the termination, and a permissible inference of pretext, that Willis was fired in retaliation for requesting and using medical leave. The defendants, therefore, are not entitled to summary judgment on the retaliation claims.

---

[13] Apparently Willis did "have access" to the file in the sense of being able to open it (unlike Patano), but she was permitted to view it ("access" it) for work purposes only.

### C.  Intentional Infliction of Emotional Distress

Finally, Willis alleges that AIC, CEC, and Lange are liable for intentional infliction of emotional distress. The defendants argue that her claim is largely preempted and, further, that it fails for insufficient evidence in support of the required elements.

#### 1. Preemption

The defendants contend that Willis's tort claim against AIC and CEC (not Lange) is preempted by the Illinois Workers Compensation Act, which provides that it is the exclusive state law remedy against an employer for accidental injuries sustained by an employee arising out of and in the course of her employment. *See* 820 ILCS 305/5, 305/11; *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 151 Ill.Dec. 560, 564 N.E.2d 1222, 1225–26 (1990). In her cursory response to this argument, Willis states only that the preemption provision "does not apply to intentional torts committed by an employer." Mem., Dkt. #60 at 14. But she does not identify the tortious action "by an employer." She is perhaps alluding to the principle that "accidental" workplace injuries—to which preemption applies— do not include "injuries which the employer or its alter ego intentionally inflicts upon an employee or which were commanded or expressly authorized by the employer." *See Meerbrey*, 564 N.E.2d at 1226. If Willis's conclusory, single-sentence argument is an attempt to invoke this exception to preemption, it is fatally underdeveloped and therefore forfeited. *See, e.g., Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014); *Jarrard v. CDI Telecomms., Inc.*, 408 F.3d 905 (7th Cir. 2005) (argument forfeited where plaintiff "failed to develop it in the district court ... with citation to relevant authority or meaningful argument"). Willis has not attempted to show that Lange or

Swanson was functionally the "employer" or its alter ego for purposes of the IWCA.[14] *See Hunt-Golliday v. MWRD*, 104 F.3d 1004, 1017 (7th Cir. 1997) ("Golliday has presented nothing indicating that Cargell had sufficient stature to be considered Metro Water"s alter ego or that Metro Water itself (or some other alter ego) commanded or authorized the alleged improper acts by Golliday's supervisors."). *See also Toothman v. Hardee's Food Systems, Inc.*, 304 Ill.App.3d 521, 710 N.E. 2d 880, 885-87 (Ill. App. Cit. 1999) (discussing at length what factors might affect whether a supervisor is employer's alter ego for IWCA preemption purposes). The tort claim therefore is preempted as to AIU and CEC.

### 2. Claim Against Lange

Illinois law requires a plaintiff claiming IIED to prove that (1) the conduct involved was "truly extreme and outrageous"; (2) the defendant either intended that her conduct inflict severe emotional distress, or knew that there was at least a high probability that her conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress. *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 269, 798 N.E.2d 75, 80 (Ill. 2003); *McGrath v. Fahey*, 126 Ill.2d 78, 86, 533 N.E.2d 806, 809 (1988). The defendants contend that Willis cannot prove these elements as to Lange, the only remaining defendant.

The evidence of extreme and outrageous conduct is not strong. Willis states that Lange "admonish[ed] Plaintiff for taking leave, threaten[ed] her job, and then shift[ed] Plaintiff's responsibilities to Patano," and then "Lange and Swanson subjected Plaintiff to a sham of an investigation" even though "everyone knew Plaintiff did not have access to her computer on one of the days the file was supposedly accessed," and Swanson already had decided to fire Willis. None of this is commendable, but, especially in the context of the workplace, Illinois courts

---

[14] The Court takes no position on it in light of plaintiff's failure to elucidate her argument.

generally have required the conduct underlying an IIED claim to be more shocking. *See, e.g., Miller v. Equitable Life Assur. Soc*., 181 Ill.App.3d 954, 537 N.E.2d 887, 889 (Ill. App. Ct. 1989) ("The fact that Graziani alleges that she was a victim of sexual harassment, battery, and retaliatory discharge does not necessarily mean that the she has a cause of action for intentional infliction of emotional distress.").

But Willis argues that a lower threshold of "extreme and outrageous" applies to her because she was peculiarly susceptible to emotional distress by reason of her physical ailment and recovery from surgery. She is correct that "[b]ehavior which (though rude, abrasive or extremely inconsiderate) may not otherwise be actionable may be deemed outrageous if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress." *McGrath v. Fahey*, 533 N.E.2d at 811. And we know that Lange, at least, knew of Willis's physical condition and even made note of the need to be "empathic" with Willis because she was "sensitive." And Willis suggests that her fibroids and her fertility challenges inherently rendered her susceptible to emotional distress[15], as in  *Naeem v. McKesson Drug Co*., 444 F.3d 593 (7th Cir. 2006), where the Seventh Circuit explained only that "the defendants knew that Ms. Naeem was pregnant at the time, and, consequently, was particularly susceptible to emotional distress." *Id*. at 606.

The workplace conduct at issue in *Naeem,* in which the Seventh Circuit reversed summary judgment, is not markedly more offensive than what is alleged here: it included "forcing Ms. Naeem to climb up an unstable metal stairway to hook up computer equipment during her pregnancy; sabotaging Ms. Naeem's computer to deny her access and alter her files;

---

[15] To the extent that is indeed Willis's argument, it approaches risky territory. But the Court understands her to be referring to the mental toll of her own physical ailment, which is unique to women, rather than assuming the emotional fragility of an entire gender. And in light of Lange's stated deference to Willis's "sensitivity," a jury would have a basis other than the mere fact of Willis's condition for inferring vulnerability.

publicly criticizing Ms. Naeem's work during meetings with other supervisors; moving her office and her transportation files, causing her to be unable to locate necessary paperwork; and increasing the amount of work due under the PIPs, knowing that Ms. Naeem would not be able to meet the deadlines." *See* 444 F.3d at 606. Here, the same kind of workplace bullying—a sham investigation into Willis's use of confidential data (assumed to be true for present purposes) in order to buttress a termination decision that already had been made by forcing an admission— might cross the threshold into "extreme and outrageous," *if* a jury concluded that Willis was peculiarly susceptible to emotional distress because of her health problems and that Lange both knew of that fragility and was a moving force behind the actions taken against Willis. It is not necessary for the Court to decide the issue as a matter of law; a jury is better equipped to determine whether Willis was peculiarly susceptible to emotional distress, and whether Lange's conduct rises to the level of extreme and outrageous. It is also more appropriate for a jury to gauge the other elements of an IIED claim, as the record contains at least some support for the propositions that Lange had the requisite state of mind and that Willis, who was treated for anxiety during the investigation, actually suffered emotional distress as a result of being (she says) set up and fired.

\* \* \*

Willis has raised a genuine issue of material fact with respect to her claims of retaliation and, against Lange, intentional infliction of emotional distress. Therefore, the defendants' motion for summary judgment is denied as those claims and granted as to the ADA discrimination claim and the IIED claim against CEC and AIC.

Date: June 19, 2015

John J. Tharp, Jr.
United States District Judge